[Cite as *Bartlett v. Tan Pro Exp., L.L.C.*, 2020-Ohio-2760.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Thomas Bartlett

     Appellant

v.

Tan Pro Exp., LLC, et al.

     Appellees

Court of Appeals No. L-19-1113

Trial Court No. CI0201801464

**DECISION AND JUDGMENT**

Decided: May 1, 2020

* * * * *

Taylor R. Ward, for appellant.

Bret C. Perry and Christopher F. Mars, for appellees.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Thomas Bartlett, appeals the May 1, 2019 decision of the Lucas County Court of Common Pleas granting summary judgment in favor of appellees, Tan Pro Exp., LLC, Tan Pro, Inc., and Tan Pro, USA (collectively, "Tan Pro"), and dismissing Bartlett's complaint. For the following reasons, we reverse.

## I. Background and Facts

{¶ 2} On April 13, 2016, Bartlett went to a tanning salon owned by Tan Pro to get his first-ever spray tan. Vicki Foster, a long-time Tan Pro employee who was the store manager, was the only employee on duty.[1] When Bartlett entered the salon, Foster signed him up for a spray tan and entered his information in the salon's computer system. After putting Bartlett into the system, Foster testified in her deposition that she took Bartlett to the spray tan room and showed him how to use the equipment. Foster did not say that there was a delay between entering Bartlett's information and taking him to the spray tan room. However, in his deposition, Bartlett recalled waiting in the lobby for 10 to 15 minutes before Foster took him to the room. During that time, Bartlett browsed the displays in the lobby. While he was waiting, Bartlett saw a customer leave the spray tan room; he did not see anyone else enter the room before Foster took him in there to explain the spray tan process.

{¶ 3} As described by Foster in her deposition, the spray tan room was a small room with a VersaSpa spray tanning booth centered on the back wall. A rubber mat was on the floor between the door and the booth. Along the left-hand wall were a chair, a paper towel dispenser, a dispenser of barrier cream (which was used to keep the tanning spray from coloring users' palms), and a timer. And on the right-hand wall were a mirror and an instructional poster. Foster also said that the room contained a hook and a shelf

---

[1] Foster is now a Tan Pro district manager, and manages twelve different Tan Pro locations in Northwest Ohio.

for users to put their belongings on, but it is unclear from her testimony where the hook and shelf were located in the room. Bartlett generally agreed with this description, but said that the chair was located against a different wall when he entered[2] and could not recall if the rubber mat was in the same position—between the door and the spray tan booth—on the day of his fall as it was in the photographs used as exhibits at his deposition.

{¶ 4} Foster described the VersaSpa machine as a booth that is a bit larger than a body scanner used in airport security. The booth works by mechanically applying a chemical tanning mist to the user's body. When the user steps into the booth and presses the start button, a voice comes on to tell him when to turn so that the tanning solution covers his whole body. Although the booth does not have a door, Foster said that the machine has a filter behind the sprayer that "sucks up" any tanning solution that does not land on the user's body, so the spray tan mist does not get outside of the booth. Foster did not know what chemicals the tanning spray contained or whether the spray was oil- or water-based.

{¶ 5} Foster said that she spent "[p]robably a couple minutes" providing Bartlett with instructions. She explained how to start the spray tan machine and that Bartlett should follow the recorded instructions that would play while the machine was running.

_____

[2] It is unclear from Bartlett's deposition testimony where he thought the chair was located. He marked the location on an exhibit, but the exhibits from his deposition are not in the record.

3.

She also told Bartlett that he could sit on the chair while he was undressing and that he should hang his clothes on the hook and put his wallet or other personal effects on the shelf. Finally, she explained that, if Bartlett did not want his palms to turn orange, he could put the barrier cream in the dispenser on the wall on his hands. Bartlett recalled that Foster told him to put the barrier cream between his fingers and on his fingernails, toenails, and feet. However, Foster testified that she had never told customers to put the barrier cream on other parts of their bodies (e.g., in between their toes or on the soles of their feet). Foster did not provide Bartlett with any safety procedures or warnings related to the spray tan booth, and she testified that Tan Pro does not have any written or verbal guides or warnings for employees to give to customers using the spray tan booth. When Foster finished giving Bartlett his instructions, she returned to the front desk.

{¶ 6} When Foster left, Bartlett undressed to his underwear. He left his clothes and shoes on the floor, against the wall to the right of the spray tan booth, because he did not see a hook to put his things on. He began walking toward the dispenser of barrier cream on the opposite wall, but fell before he reached it. Although Bartlett was not looking down at the mat at the time, he said that he slipped on some type of oily, shiny fluid on the mat, which he felt on his foot and saw while he was lying on the floor after he fell. Bartlett did not see the fluid before his fall, did not know how long the fluid had been on the mat, and did not know if anyone at Tan Pro knew that the fluid was there.

{¶ 7} When Bartlett fell, he landed on the cement floor, hitting his left hip and ankle. He described the pain in his hip after the fall as "tremendous." He tried to get up,

4.

but could not. While trying to get up, he positioned himself so that he was partially on the rubber mat and facing toward the booth (with his back to the door of the spray tan room). When Bartlett was unable to get up, he yelled for help. He estimated that he was on the floor for three to five minutes before Foster came to the room.

{¶ 8} After waiting on a few customers, Foster noticed that the spray tan machine had not turned on, so she went to the room to check on Bartlett. She denied hearing him calling or yelling through the door. Bartlett said that he was not okay and gave Foster permission to open the door. Foster saw Bartlett lying on the floor, partially on the rubber mat, with his back and shoulders toward the door and his face toward the spray tan booth. She also saw his clothes on the floor behind the door—not hanging on the hook, as she instructed—and one shoe on each side of his body. Although Foster did not see Bartlett fall, she believed, based on the position of his belongings, that he may not have fallen if he had put his clothes on the hook and put his shoes out of the way. Foster called 911 for an ambulance because Bartlett could not get up.

{¶ 9} The ambulance took Bartlett to St. Vincent Hospital. Ultimately, Bartlett was diagnosed with a fractured femur, which required two surgeries and weeks of rehabilitation to correct and resulted in lasting impairments to his ability to lift things, his mobility, and his enjoyment of his hobbies.

{¶ 10} While the EMTs were attending to Bartlett, Foster called Tan Pro's corporate office to report the incident. The person she spoke to reminded her to fill out an incident report. Foster said that Tan Pro policy required employees to complete an

5.

incident report whenever someone was hurt in a Tan Pro store. After Bartlett was taken from the store by ambulance, Foster filled out an incident report and took pictures to include with the report.[3] Although Foster thought that it was important to take pictures and preserve evidence of what happened "[b]ecause [Bartlett] left on a stretcher," she admitted that she moved the chair in the spray tan room from the place where Bartlett left it and cleaned the floor mat before taking the pictures.

{¶ 11} Foster testified that cleaning the tanning rooms was one of her responsibilities. Tan Pro required employees to clean each tanning room throughout the day after a customer used the room. Cleaning a room required the employee to wipe down the tanning equipment, paper towel dispenser, seat, door handle, and floor mat using a towel and a liquid disinfectant. According to Foster, any employee who did not follow this cleaning protocol "would be in trouble." Foster also agreed that Tan Pro has a duty to inspect the spray tan rooms after each customer uses them, and a duty to inspect

---

[3] Tan Pro included an unauthenticated copy of the incident report with its reply brief in support of its motion for summary judgment. In addition to not being appropriate summary judgment evidence under Civ.R. 56(C) (which limits the evidence that a court can consider to "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact * * *"), the incident report is largely illegible. Although we have the discretion to consider evidence outside of Civ.R. 56(C) when the opposing party does not object to the improper evidence, we are not required to do so. *State ex rel. Spencer v. E. Liverpool Planning Comm.*, 80 Ohio St.3d 297, 301, 685 N.E.2d 1251 (1997). In this case, Bartlett did not object to Tan Pro including the incident report with its reply brief. Nevertheless, we decline to consider the report because the pertinent parts of it—specifically, the sections headed "Nature of Injury," "Cause of the accident," and "How did the accident occur?"—are indecipherable.

6.

spray tan rooms to ensure that the floors are dry and that there are no fluids or oils on the floor.

{¶ 12} In addition to cleaning the tanning rooms, Tan Pro employees had lists of cleaning tasks they were required to perform before opening, throughout the day, and before closing. The list of opening duties required, among other things, that the employee conduct a "bed test" to ensure that the tanning beds were working and that there was "nothing in the room. Everything is clean and sanitary." Midday duties included checking the floors for "[t]hings left behind. Paper towels on the ground, wrappers on the ground." Although Foster testified to general cleaning duties and said that she was "[p]retty confident" that she had the spray tan room "spotless," she did not testify that she cleaned the spray tan room before Bartlett entered the room on April 13, 2016.

{¶ 13} Each Tan Pro location uses paper cleaning logs to keep track of cleaning tasks that employees complete. According to Foster, Tan Pro has the logs "for our records to make sure that [the cleaning tasks] are getting done," but is not required to keep them, so store managers throw them away after a short period of time. Foster said that she disposed of the cleaning logs for April 13, 2016, approximately three months after the incident because the papers "started piling up and [she] didn't need to [keep the logs]."

{¶ 14} Based on these facts, Tan Pro moved for summary judgment. Tan Pro argued that it did not create or have notice of the dangerous condition that caused

7.

Bartlett's fall and did not owe Bartlett a duty of care because he slipped on an open and obvious hazard. Bartlett responded that Tan Pro breached its duty of care to him by creating a hazard, failing to warn him of latent dangers on the property, and failing to reasonably inspect the facility.

{¶ 15} On May 1, 2019, the trial court issued its summary judgment decision. The court found that Bartlett did not show that Tan Pro breached its duty of care to him because he did not present evidence showing that Tan Pro caused the hazard, had knowledge of the hazard and failed to warn him of it, or had constructive knowledge of the hazard because of the length of time it had existed. Consequently, the trial court granted summary judgment in Tan Pro's favor and dismissed Bartlett's claims.

{¶ 16} Bartlett now appeals, raising three assignments of error:

1. The trial court erred in finding no issue of fact that supported Defendants/ Appellees having a duty of care to maintain the premises to be free from dangerous conditions arising from Defendants/Appellees' planned and created hazard that invitees will encounter on the premises, specifically a spray tan booth installed without a door that Defendants/Appellees knew would result in oil on the surrounding floor and mat.

2. The trial court erred in finding that no issue of fact exists that the Defendants/ Appellees had actual or constructive knowledge of a latent or concealed danger and failed to warn or remove it.

8.

3. The trial court erred in finding that there was no issue of fact that Defendants/ Appellees breached their duty of ordinary care to reasonably inspect the premises and maintain it in a safe condition.

## II. Law and Analysis

{¶ 17} In each of his three assignments of error, Bartlett argues that the trial court erred by finding that no issues of material fact remained and granting summary judgment to Tan Pro. For ease of discussion, we address Bartlett's assignments of error together.

{¶ 18} An appellate court reviews summary judgment de novo, employing the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The court can grant a motion for summary judgment only when the moving party demonstrates:

(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978); Civ.R. 56(C).

{¶ 19} The party seeking summary judgment must specifically delineate the basis upon which the motion is brought and identify those portions of the record that

9.

demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996); *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus. When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). The opposing party must do so using "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact * * *." Civ.R. 56(C). A "material" fact is one that would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 827, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

{¶ 20} To establish a cause of action for negligence, a plaintiff must show "the existence of a duty, a breach of the duty, and an injury proximately resulting therefrom." *Texler v. D.O. Summers Cleaners & Shirt Laundry Co., 81 Ohio St.3d 677, 680, 693 N.E.2d 271 (1998).* In premises liability cases, such as this one, the landowner's duty depends upon the status of the injured party at the time of the incident. *Madison v. Raceway Park, Inc.*, 6th Dist. Lucas No. L-08-1279, 2009-Ohio-4068, ¶ 14, citing *Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 2009-Ohio-2495, 909 N.E.2d 120, ¶ 10. Here, it is undisputed that Bartlett was a business invitee at the time he fell.

10.

{¶ 21} Generally, a business owes an invitee a duty of ordinary care, which requires the business to maintain the premises in a reasonably safe condition. *Paschal v. Rite Aid Pharmacy, Inc.*, 18 Ohio St.3d 203, 480 N.E.2d 474 (1985). Although a business is not an insurer of a customer's safety, *id.*, "the obligation of reasonable care is an extensive one * * *," *Jackson v. Kings Island*, 58 Ohio St.2d 357, 359, 390 N.E.2d 810 (1979), that encompasses the duties to (1) not create hazards on the premises and (2) warn of known latent or concealed dangers. *Stewart v. ST Performing Arts, LLC*, 6th Dist. Lucas No. L-19-1023, 2019-Ohio-4508, ¶ 15, citing *Paschal* at 203, and *Ray v. Wal-Mart Stores, Inc.*, 2013-Ohio-2684, 993 N.E.2d 808, ¶ 18 (4th Dist.); *Beck v. Camden Place at Tuttle Crossing*, 10th Dist. Franklin No. 02AP-1370, 2004-Ohio-2989, ¶ 21, citing *Perry v. Eastgreen Realty Co.*, 53 Ohio St.2d. 51, 52, 372 N.E.2d 335 (1978).

{¶ 22} To show that a latent or concealed danger was "known" to the business, the invitee must show that the business had either actual or constructive knowledge of the danger. *Perry* at 52. A business has constructive knowledge of a hazard if the hazard (1) existed for an amount of time sufficient to justify an inference that the business's failure to warn against or remove it was attributable to a lack of ordinary care, *or* (2) would have been revealed by a reasonable inspection of the premises. *Presley v. City of Norwood*, 36 Ohio St.2d 29, 32, 303 N.E.2d 81 (1973); *Beck* at ¶ 21. An invitee who alleges that the business failed to reasonably inspect the premises is not required to prove how long the hazard existed on the premises. *Beck* at ¶ 28.

11.

{¶ 23} Here, Bartlett claims that Tan Pro breached its duty to him in three ways: (1) Tan Pro created the hazard by installing a machine without a door that sprays oily liquid, which, "as a result of common sense and gravity * * *," caused the oily liquid to accumulate on the mat in front of the machine; (2) Tan Pro had knowledge of the hazard, evidenced by its admission that "the spray tan rooms are anticipated to spray the oily substance and would create a hazard to invitees, unless removed," and failed to warn him of it; and (3) Tan Pro failed to reasonably inspect the store and maintain it in a safe condition. He argues that genuine issues of material fact remain regarding each of these breaches.

{¶ 24} Bartlett's first two arguments—i.e., that Tan Pro created the hazard that caused his fall, and knew that liquid would fall on the mat from the spray tan machine, but failed to warn him about it—are not supported by the record. There is no evidence that the spray tan machine had a door that Tan Pro removed or chose not to install or that a door would have prevented fluid from accumulating on the mat (or, really, whether the fluid that Bartlett said he felt on the mat even came from the spray tan machine). No one testified that the spray tanning chemical was, in fact, an oily liquid; Bartlett never saw or felt the spray tanning chemical and Foster did not know what the chemical was or whether it was oil- or water-based. And Foster testified that the machine is equipped with a filter that "sucks up" excess tanning chemical, which prevents the mist from getting outside of the machine. None of this shows that the spray tan machine, as

installed and operated by Tan Pro, created a hazard or gave Tan Pro knowledge of a latent hazard.

{¶ 25} But, we find that the evidence—when viewed in a light most favorable to Bartlett as the nonmoving party—demonstrates that a question of fact exists regarding whether Tan Pro breached its duty to reasonably inspect the store and maintain it in a safe condition. That is, Bartlett and Foster provided conflicting deposition testimony on two overarching factual issues: (1) whether there was some type of liquid on the mat that caused Bartlett to fall, and (2) if Bartlett did slip on liquid, whether the liquid was on the mat because Foster failed to inspect and clean the room before Bartlett entered it.

{¶ 26} Regarding the first issue—whether Bartlett slipped on liquid on the mat—Foster said that she was "[p]retty confident" that the spray tan room was "spotless," and neither Bartlett nor Foster saw anything on the mat before Bartlett's fall. Foster also testified that it appeared to her that Bartlett must have tripped over his clothing and shoes, which were on the floor near where he fell (rather than where she had instructed Bartlett to put them). Bartlett, however, testified that he felt an oily substance under his foot and that he "slipped on a fluid." Bartlett also testified that he saw a "shiny fluid" on the mat after his fall. Although Foster took photographs of the mat after Bartlett fell—and those photos do not show any liquid—Foster admitted that she cleaned the mat before taking the pictures. By doing so, she potentially removed any liquid that might have been there before Bartlett's fall. Accordingly, we find that there is a question of fact regarding whether there was any liquid on the mat that caused Bartlett to slip and fall.

13.

{¶ 27} Regarding the second issue—whether such liquid, if present, was on the mat because Foster did not clean the tanning room before Bartlett entered it—Foster testified that Tan Pro had a policy that required employees to clean each tanning room after a customer used it, including wiping down the mat. Foster also agreed that Tan Pro has a duty to inspect the spray tan rooms after each customer uses them, and a duty to inspect spray tan rooms to ensure that the floors are dry and that there are no fluids or oils on the floor.

{¶ 28} Although Foster testified regarding Tan Pro's *general* cleaning and inspection procedures, reasonable minds could reach different conclusions regarding what *actually* occurred on the day that Bartlett fell. Although Foster testified that she was "[p]retty confident that [she] had that room spotless," it is not clear why Foster felt that way. Foster did not testify that she cleaned the room after the prior customer used it and before Bartlett entered it. Perhaps Foster's opinion was based on her casual observations when she entered the room with Bartlett. Or maybe Foster was assuming that the room was "spotless" for Bartlett because her common practice is to maintain "spotless" rooms for customers. Regardless of the basis for Foster's testimony, such evidence is not sufficient to award summary judgment in this case because Bartlett testified that he did not see anyone else go in or out of the tanning room after the prior customer left the room. He also testified that, in his opinion, it was impossible that someone went into the tanning room without him seeing it, "because [he] was standing in line to go in." Bartlett's recollection conflicts with Foster's on this issue as well, because

Foster did not describe any delay between entering Bartlett's information upon arrival and taking him to the spray tan room.

{¶ 29} Of course, it is possible that Foster did, in fact, clean the room before Bartlett entered it (consistent with Tan Pro's cleaning and inspection procedures), and Bartlett simply did not see her enter or exit the room because he was distracted while browsing Tan Pro's display case in the lobby. Moreover, the relevant cleaning logs, which would shed some additional light on the situation, no longer exist.

{¶ 30} If nobody cleaned the room after the prior customer existed the room and before Bartlett entered it, a reasonable factfinder could conclude that Tan Pro failed to conduct a reasonable inspection of its premises that would have revealed the existence of liquid on the mat (assuming that the factfinder also determines that there was, in fact, liquid on the mat that caused Bartlett's fall). In other words, construing the evidence in Bartlett's favor, reasonable minds could conclude that Bartlett's injuries resulted from the presence of liquid on the mat that Tan Pro admits should have been cleaned, but was not actually cleaned, before he entered the spray tan room. It is impossible to resolve this issue without determining the credibility of Bartlett's and Foster's respective testimony, and it is well settled that a "trial court is not permitted to weigh credibility when considering evidentiary material presented in favor of, or in opposition to, a motion for summary judgment." *Hutchison v. Kaforey*, 2016-Ohio-3541, 67 N.E.3d 121, ¶ 34 (9th Dist.). Moreover, as this court has recognized, "summary judgment is to be used with caution." *Guhn v. Bd. of Edn., Clyde-Green Springs School Dist.*, 6th Dist. Sandusky No.

S-88-16, 1989 WL 72245, *7 (June 30, 1989). That is, "even where it is not abundantly clear from the record that summary judgment was inappropriate * * * this court must consider the evidence in the light most favorable to appellants." *Id.*, citing *Engel v. Corrigan*, 12 Ohio App.3d 34, 465 N.E.2d 932 (8th Dist.1983).

{¶ 31} In sum, the evidence in the record—when viewed in a light most favorable to Bartlett as the nonmoving party—demonstrates that there are genuine issues of material fact regarding whether Tan Pro breached its duty of care to Bartlett.

{¶ 32} Tan Pro, however, claims that it did not owe Bartlett a duty because the liquid he allegedly slipped on was open and obvious. When a danger is open and obvious, a business owes no duty to an invitee because "'the open and obvious nature of the hazard itself serves as a warning.'" *Armstrong v. Best Buy Co., Inc.*, 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, ¶ 5, quoting *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 644, 597 N.E.2d 504 (1992). Whether a danger is open and obvious is determined by the facts of the case. *Miller v. First Internatl. Fid. & Trust Bldg., Ltd.*, 6th Dist. Lucas No. L-08-1187, 2009-Ohio-6677, ¶ 68. Only when the facts are not in dispute can a court determine whether a danger was open and obvious as a matter of law. *Plock v. BP Prods. NA, Inc.*, 6th Dist. Lucas No. L-05-1423, 2006-Ohio-5472, ¶ 7.

{¶ 33} Here, although Tan Pro claims that Bartlett admitted during his deposition that he saw fluid on the mat *before* his fall, we find that Bartlett's deposition testimony— read as a whole—is, at best, ambiguous on that point. In fact, when his deposition transcript is read as a whole, it appears that Bartlett testified that he felt some "oily" fluid

under his foot before he fell, and then saw a "shiny fluid" on the mat after his fall. Regardless, as we discuss above, a question of fact remains regarding whether there was, in fact, liquid on the mat when Bartlett fell—which necessarily precludes application of the open and obvious doctrine in this case.

### III.  Conclusion

{¶ 34} In conclusion, the record supports the trial court's findings that Bartlett failed to show that Tan Pro created the hazard that caused his fall or had constructive knowledge of the hazard based on the nature of the spray tan machine itself.  Bartlett's first and second assignments of error are therefore not well-taken.

{¶ 35} But, we find that the trial court erred in granting summary judgment to Tan Pro because genuine issues of material fact remain regarding whether Tan Pro failed to reasonably inspect its store.  For that reason, Bartlett's third assignment of error is well-taken.

{¶ 36} Based on the foregoing, the May 1, 2019 judgment of the Lucas County Court of Common Pleas is reversed and the case is remanded for further proceedings consistent with this decision.  Tan Pro is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.
_____
JUDGE

Gene A. Zmuda, P.J.
CONCUR.
_____
JUDGE

Thomas J. Osowik, J.
DISSENTS AND WRITES
SEPARATELY.

**OSOWIK, J.**

{¶ 37} I respectfully dissent from the majority opinion in this case.

{¶ 38} When ruling on summary judgment, our appellate role on de novo review is not to speculate on facts absent from the record or to interpret a meaning onto the facts that is not directly supported by the record. "The main purpose of the summary judgment statute is to enable a party to go behind allegations in the pleadings and assess the proof

in order to see whether there is a genuine need for trial." *Cunningham v. J. A. Myers Co.*, 176 Ohio St. 410, 413, 200 N.E.2d 305 (1964) (evaluating former R.C. 2311.041(D), now Civ.R. 56). Where there are claims and defenses having no factual basis, summary judgment allows a trial court to resolve them prior to trial. *Pettiford v. Aggarwal*, 126 Ohio St.3d 413, 2010-Ohio-3237, 934 N.E.2d 913, ¶ 21, citing *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 11 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

{¶ 39} Because I find there are no admissible facts in the record supporting a genuine issue of material fact that appellees had either actual or constructive notice of the "oily substance" on the spray tanning room mat on April 13, 2006, I would affirm the trial court's grant of summary judgment to appellees, who, as the moving parties, were entitled to judgment as a matter of law.

{¶ 40} Appellant does not present a unique set of facts with respect to his slip-and-fall in a spray tan room.

> To recover in a slip and fall negligence case against the premises owner, the invitee must establish: (1) that the premises owner through its officers or employees was responsible for the hazard complained of; or (2) that at least one of those persons had actual knowledge of the hazard and neglected to give adequate notice of its presence or remove it promptly; or (3) that the danger had existed for a length of time sufficient to justify

19.

the inference that the failure to warn against it or remove it was attributable to a lack of ordinary care.

*DeVault v. St. Charles Mercy Hosp.*, 6th Dist. Lucas No. L-05-1292, 2006-Ohio-1626, ¶ 14, citing *Johnson v. Wagner Provision Co.*, 141 Ohio St. 584, 589, 49 N.E.2d 925 (1943). "If a plaintiff cannot show that a defendant had actual knowledge of an existent hazard, evidence as to the length of time the hazard had existed is necessary to support an inference that defendant had constructive notice." *Presley v. City of Norwood*, 36 Ohio St.2d 29, 32, 303 N.E.2d 81 (1973).

{¶ 41} The record is devoid of evidence of such notice, which is an essential element to appellant's negligence claim. To find such evidence requires unauthorized speculation to conjure a genuine issue of material fact exists for a jury to resolve. I cannot join the majority in that pursuit.

## I. No Actual Notice

{¶ 42} It is undisputed in the record that neither appellant nor appellees had actual knowledge of the "oily substance" prior to appellant's fall. Appellant testified at his deposition he slipped on a "shiny fluid on the mat, I can't tell you what it was." In his complaint, he alleged it was "water or some other transitory substance." Appellant admits he was not aware of the "oily substance" until after he fell: "When my foot went up, I was on something, then when I fell I didn't see it until I got on – hit the rug, that's all I can tell you, I didn't see it. I didn't think there was anything on it from the distance I was at." Appellant, a first-time spray tan customer, could not testify that the chemical

20.

emitted by the sprayer in the booth was both an "oily mist" and "clear" in color because he never activated it before he fell.

Q: Fair to say you would have no idea whether anyone at Tan Pro was aware of that fluid?

A: Correct, that I know of, yes.

Q: Okay. I assume you're not aware of anyone else falling at the facility in the past?

A: I have no idea.

{¶ 43} Victoria Foster testified at her deposition there was no notice of an "oily substance" on the spray tan room mat. As the only TanPro employee on duty at the time of the incident, Ms. Foster was "[p]retty confident that I had that room spotless" before she led appellant to the spray tan room.

Q: When you went into the room with him and talked about the equipment, talked about the barrier cream, talked about clothes, did you see any substances on the mat?

A: No.

Q: Nothing was readily observable to you that was on the mat at that time?

A: Not at all.

21.

## II. No Constructive Notice

{¶ 44} To create a genuine issue of material fact for a jury to resolve regarding appellees' constructive notice of the "oily substance," appellant argues "no one inspected or cleaned the spray tan room before he was led into the room for the spray tan. * * * [Appellant] observed a customer leave the spray tan room. [Appellant] did not see anyone enter the room before he was led into the room by Ms. Foster."

{¶ 45} In Ms. Foster's 18 years with the company, Tan Pro maintained a policy book detailing all of the tasks at the store for all of the treatments, including cleaning responsibilities, signing up customers, how to enter sales, opening store procedures, and closing procedures. Tan Pro also maintained instruction manuals for the VersaSpa spray tan booth: "How to check the sprayer, the solution, how to reset it, how to clean it and troubleshooting." She uses Lucasol to disinfect the rubber mat in the spray tan room, and either gets on her hands and knees or bends over to wipe down the mat with a single-use towel. In addition to the mat, she disinfects "[t]he equipment that the person was in, the paper towel holder, the door handle, the seat. Everything is wiped down every time." The cleaning process usually takes five minutes. The cleaning protocols are performed "[a]fter every client goes into the room and tans. In the morning before the store opens, and before it closes, and throughout the day."

{¶ 46} Appellant's sole rebuttal to Ms. Foster's testimony of the cleaning protocols she followed that day is merely to say he did not witness her enter the room. "Self-serving testimony which baldly contradicts the evidence offered by the moving

22.

party is insufficient to create a genuine issue of fact." *Bates Recycling, Inc. v. Village of Cygnet Fire Dept.*, 6th Dist. No. WD-11-060, 2012-Ohio-4185, 976 N.E.2d 962, ¶ 20.

{¶ 47} Even when viewing the evidence in a light most favorable to appellant, he cannot establish constructive notice the "oily substance" existed a sufficient length of time to justify the inference that appellees failed to warn him against it or remove it due to a lack of ordinary care. Ms. Foster testified cleaning the spray tan room after a customer takes about five minutes. From the facts that appellant alleged, he did not see Ms. Foster clean the spray tan room during his 10-15 minute wait in the lobby after he saw the prior customer exit from it. We must speculate to reach the inference that appellant trained his attention on Ms. Foster's movements during his entire wait, without distraction, in support of this "fact." However, appellant testified he did not do that. While he waited in the lobby, he spent the time looking at the displays, "at different lotions they had in there * * * they had all kinds of things in their display case."

{¶ 48} The "piling" of inference upon inference, which amounts to impermissible speculation, also does not create a material issue of fact to defeat summary judgment. *Moore v. Ohio Valley Coal Co.*, 7th Dist. Belmont No. 05 BE 3, 2007-Ohio-1123, ¶ 45; *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988), citing Civ.R. 56(E).

{¶ 49} The record contains information regarding the VersaSpa spray tan booth as an exhibit to Ms. Foster's deposition. The booth is where a customer stands upright holding various positions while the spray tan chemical covers the customer. Prominently displayed on one wall in the spray tan room is a VersaSpa poster entitled, "Easy Steps to

23.

a Flawless Sunless Tan," and outlining four steps for the customer to follow. The poster provides 12 visual examples of a silhouetted man following each of the steps in the "spray treatment" process and of the steps in the "blow dry treatment" process, which occurs twice. Based on the VersaSpa spray tan booth's design, when Ms. Foster was asked, "Does the spray tan mist ever get outside of the booth?" She answered, "No."

Q: This mist, how does the booth control where the mist goes?

A: There's a filter behind where it sprays so it sucks up what doesn't go on your body.

{¶ 50} From the fact that appellant fell and the fact he "observed a customer leave the spray tan room," we must make impermissible stacked inferences about the prior customer on April 13, 2016, in order to reach the inference that appellee had notice of the accumulated "oily substance": (1) that the prior customer in the VersaSpa spray tan booth did not follow the two-time drying process before exiting the booth, (2) that the prior customer then stepped onto the rubber mat "having been soaked in a spray tan oil from head to foot," according to appellant, and deposited the "oil" on the rubber mat, and (3) that despite depositing all of that "oil" on the rubber mat, the prior customer dressed and exited the room over the rubber mat, while facing the same hazard that appellant faced. Finally, we must also speculate that when both Ms. Foster and appellant were in the spray tan room as she explained the treatment, they both somehow navigated around the accumulated "oil" hazard appellant insists was left by the prior customer and present

24.

on the rubber mat when he entered the room. There is no evidence to support any of those speculations.

{¶ 51} Appellant also failed to provide evidentiary support that Tan Pro's cleaning policies were unreasonable. We cannot infer from Ms. Foster's admission that Tan Pro's policy of cleaning after every use of the spray tan room equates to appellees having constructive knowledge of the alleged "oily substance" prior to appellant entering the room on April 13, 2016. *Schneider v. MFB Hamilton Properties*, 6th Dist. Lucas No. L-11-1039, 2011-Ohio-5686, ¶ 16. I find the cleaning policy to be reasonable. *DeVault v. St. Charles Mercy Hosp.*, 6th Dist. Lucas No. L-05-1292, 2006-Ohio-1626, ¶ 15.

{¶ 52} Appellant's reliance on a violation of Ohio Adm.Code sections 4713-19-05(B), (C)(1), (C)(2), and 4713-19-06(B) is misplaced. Ohio Adm.Code 4713-19-05(B) lists certain guidelines for "chemical tanning," none of which are at issue in this appeal. Ohio Adm.Code 4713-19-05(C)(1) lists as a "general facility operation" regulation, "Facilities shall regularly inspect the facility to ensure that the floors are dry." Ms. Foster testified as to appellees' cleaning policies and practices and as to how she left the spray tan room "spotless." I do not find appellees failed to follow this regulation simply because appellant says he did not see Ms. Foster enter the spray tan room between the time he saw the prior customer exit and when Ms. Foster led him to it. I also do not find appellees failed to follow Ohio Adm.Code 4713-19-05(C)(2), which states, "Facilities shall ensure that non-absorbent flooring or rubber or plastic mats are in place where an individual enters or exits equipment used in the tanning process, and that the

25.

non-absorbent flooring or mats are disinfected after each use," or failed to follow Ohio Adm.Code 4713-19-06(B), which states, "The walls, floors, ceilings, and fixtures in the facility shall be maintained in a safe condition, and kept in a clean and sanitary manner at all times." I find that Ohio Adm.Code 4713-19-02(B) defines "chemical tanning" as "the application of chemicals to the skin to provide a tanned appearance without exposure to ultraviolet radiation, and includes chemical applications commonly referred to as spray-on, mist-on, or sunless tans." The regulation does not define the chemical as either an "oil" or "oily substance," and does not support an inference of appellant's alleged "fact" he fell on an "oily substance."

{¶ 53} I also find Evid.R. 407 precludes our consideration of evidence of subsequent remedial measures, such as Ms. Foster cleaning the spray tan room after appellant left the facility in an ambulance, because such evidence "is not admissible to prove negligence or culpable conduct in connection with the event." Based on the record, such cleaning is part of the ordinary course of business operations and does not establish prior notice.

{¶ 54} For the foregoing reasons I respectfully dissent and would affirm the judgment of the trial court granting summary judgment to appellees.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.