**[Cite as *Shaver v. Peters*, 2023-Ohio-1097.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Bradley Shaver, II, et al.

Appellants

v.

Lester A. Peters, et al.

Appellees

Court of Appeals No.  E-22-028

Trial Court No.  2017 CV 0313

**<u>DECISION AND JUDGMENT</u>**

Decided:  March 31, 2023

* * * * *

James W. Hart and Mark P. Smith, for appellants.

Colin P. Moeller, for appellees.

* * * * *

**ZMUDA, J.**

## I.    Introduction

{¶ 1} Appellant, B.S., appeals the judgment of the Erie County Court of Common Pleas, granting a motion for summary judgment filed by appellees, L.P. and his parents, Le.P. and M.P., thereby dismissing all claims against Le.P. and M.P.  Finding no error in the trial court's judgment, we affirm.

## A. Facts and Procedural Background

{¶ 2} On June 16, 2017, appellant, through his parents, Br.S. and C.S., filed a complaint in the trial court, alleging that he was sexually abused by L.P. over an "extended period of time" when he and L.P. were neighbors. Relevant to this appeal, appellant's complaint included a claim of negligent supervision against Le.P. and M.P., based upon their alleged failure to provide proper parental supervision over L.P.[1] After motion practice and discovery, appellant amended his complaint on June 17, 2020, and added a claim for spoliation of evidence against Le.P. and M.P. based upon their alleged disposal of L.P.'s iPod, which L.P. allegedly used to access pornographic material and distribute such material to appellant.

{¶ 3} During the pendency of this matter, the parties conducted extensive discovery and several witnesses were deposed. C.S. was the first witness to be deposed. During her July 13, 2018 deposition, C.S. testified that she first learned of the sexual activity between appellant and L.P. on the evening of the final incident in May or June of 2015. After appellant disclosed the sexual activity, he shared the information with Br.S. Upon receiving this information, C.S. and Br.S. called M.P. and informed her of the incident. Thereafter, M.P. and Le.P. came over to appellant's home, and appellant

---

[1] Appellant's complaint also included claims for assault, battery, and negligent infliction of emotional distress against L.P. The trial court's judgment that is before us in this appeal did not dispose of those claims.

2.

discussed the incident with them in the presence of C.S. and Br.S. According to C.S., appellant reported that the final incident involved oral sex, not anal penetration.

{¶ 4} Later in her deposition, C.S. stated that she questioned appellant as to how many times L.P. touched him inappropriately. Appellant informed her that L.P. had done so "multiple times." C.S. confidently asserted that none of these incidents occurred inside her home, because she "was always present." Further, C.S. indicated that she was unaware of whether Le.P. or M.P. were present during any of the incidents that occurred in L.P.'s home.

{¶ 5} C.S. recalled two additional incidents that occurred prior to appellant's June 2015 disclosure of sexual assault. The first incident involved L.P. locking appellant in L.P.'s bedroom. Appellant told C.S. that L.P. did not touch him during this incident. C.S. testified that she contacted M.P. and informed her that L.P. had locked appellant in the bedroom. According to C.S., M.P. assured her that "she'd take care of it."

{¶ 6} The second alleged incident involved L.P. watching pornography with appellant at L.P.'s home. Again, C.S. stated that she contacted M.P. and informed her of the situation, and M.P. "said she'd take care of it."

{¶ 7} Appellant was deposed on July 10, 2019. During appellant's deposition, he testified that he and L.P. were friends when they were younger and would routinely spend time with one another, especially at L.P.'s home where L.P. lived with Le.P., M.P., and his sister, Li.P. Appellant went on to state that he and L.P. engaged in sexual activity

3.

"between 15 and 20" times prior to 2017, when appellant and his family moved out of their home near L.P. According to appellant, the sexual activity occurred over a three-year period beginning when he was in the second grade and L.P. was in the fourth grade. Despite his specificity as to the total number of incidents, appellant stated that he did not "know when any of the other events were, except for the first and the last." Appellant explained that the sexual activity that occurred between he and L.P. varied, as follows: "Sometimes it would be [L.P.] sticking [his penis] in my mouth. Me sticking it in his mouth. Me putting mine in his butt or his in mine. Sometimes he'd make me watch porn and masturbate."

{¶ 8} According to appellant, the first sexual contact between he and L.P. took place on a trampoline located in the side yard of a neighbor's house. Only appellant and L.P. were on the trampoline at the time of the incident. As the two were jumping on the trampoline, L.P. allegedly forced appellant to pull down his pants so that L.P. could perform oral sex on appellant. After about 20 seconds, the encounter ended. Appellant testified that he did not disclose the incident to his parents.

{¶ 9} The final sexual contact between appellant and L.P. occurred when appellant was in the fifth grade. Appellant recounted that the incident "took place in [L.P.'s] backyard. They had a fence at the time. They had a brand new barn built, and it happened in between the fence and the barn in the little crack in between." At the time, appellant and L.P. were playing outside. As they made their way behind the fence, L.P.

4.

grabbed appellant and told him to pull down his pants. Appellant reported that he told L.P. he did not want to pull down his pants, but he was unable to break free from L.P., so he acquiesced to L.P.'s demands. Appellant testified that L.P. then "stuck his penis in my butt, and that was it." After the incident concluded, L.P. gave appellant $25 in cash and appellant ran home.

{¶ 10} Later that day, C.S. questioned appellant about how he received the $25 in cash. Ultimately, appellant disclosed the sexual encounter with L.P., prompting C.S. to meet with Le.P. and M.P. later in the evening. The following day, M.P., a trained nurse practitioner, conducted a physical examination of appellant in the presence of Br.S. and C.S.

{¶ 11} When asked whether anyone witnessed these incidents, appellant responded in the negative. Appellant further acknowledged that he did not disclose the abuse to his parents while it was ongoing, because L.P. "was bigger than me and I thought he was going to hurt me." Appellant testified that he disclosed the sexual contact between he and L.P. to his friend, I.S., "sometime before the last occurrence." He testified that he told I.S. that L.P. "was doing weird stuff to me, or sexual acts, and that to keep it quiet."

{¶ 12} For his part, L.P. was deposed on two separate occasions in connection with this case. The first deposition took place on July 11, 2019, one day after appellant was deposed. At the outset of the deposition, L.P. was asked how many times he had

5.

sexual contact with appellant. L.P. responded that there were three such incidents, which occurred over a period of six to eight weeks from April 2015 through "early June or late May of 2015." L.P. stated that he had no further sexual encounters with appellant and had not engaged in any other sexual activity with anyone else up to this point in his life. Moreover, L.P. denied ever locking appellant in his bedroom or forcing appellant to view pornography with him.

{¶ 13} According to L.P., the first incident occurred on his neighbor's trampoline. He further testified that he did not tell his parents or anyone else about this incident. The second incident occurred in L.P.'s bedroom. Both of these incidents involved oral sex performed by L.P. on appellant. L.P. stated that the third incident occurred behind the barn in his back yard. The incident began with oral sex. Eventually, L.P. attempted anal penetration. When this was unsuccessful, the incident came to an end. L.P. and appellant then "discussed how, like a plan of how [appellant] got the money so that way he [could] explain to his parents if they [asked] him how he got the money. And we agreed to never talk about it to each other."

{¶ 14} L.P. testified that he never discussed his sexual ideas or urges with either parent or his sister prior to the sexual incidents described above. Further, L.P. was unable to recall whether either parent was home when the three incidents occurred. However, he later acknowledged that one of his parents must have been home, because he was not left alone in the house in 2015 "for safety reasons." When asked whether

6.

Le.P. and M.P. were aware of his sexual activity with appellant, L.P. responded "they didn't know." He was asked how he knew his parents were unaware of his sexual activity and he stated "I never told them about it." Moreover, L.P. indicated that he sought to keep the sexual activity a secret, and trusted appellant to keep the activity confidential as well.

{¶ 15} During the deposition, L.P. acknowledged that he had two iPods when he was younger. Beginning approximately one year before the sexual incidents at issue in this case began, L.P. began accessing pornographic material on his first iPod, which he called his "old iPod 4." L.P. insisted that he only accessed this material from his bedroom, and he never viewed it with anyone else.

{¶ 16} L.P. could not remember when he first received the old iPod, but he indicated that Le.P. and M.P. "wiped clean" the hard drive on the old iPod when they provided L.P. with the new iPod. According to L.P., his parents were unaware of any elicit content on the old iPod, and they erased the content from the hard drive to free up storage on the devise so that they could use it for music. L.P. offered no testimony as to whether he ever viewed pornography on his new iPod, and no questions were directed to him to elicit any such testimony.

{¶ 17} Le.P.'s deposition was taken on January 14, 2020. During his deposition, Le.P. stated that he was a detective for the city of Sandusky from 2010 until 2016. He testified that appellant frequently came over to his house to play with L.P. and Li.P.

7.

According to Le.P., the children would regularly play with LEGOs, games, and video games. Le.P. stated that he was not home every time appellant was over, and he further indicated that he never heard any screaming coming from the upstairs game room where the children would usually play.

{¶ 18} Turning to the allegations of sexual abuse involving appellant and L.P., Le.P. stated that he first learned of the abuse on the evening of the final incident in June 2015. At that time, L.P. confessed to Le.P. learned that he and L.P. "had contact – sexual contact out in the backyard." According to Le.P., appellant indicated that the sexual contact consisted of oral sex. Further, L.P. told Le.P. that he and appellant "were behind the barn, he had asked if he could place his penis in [appellant's] rectum; [appellant] said yes, and before my son did it, [appellant] said no, and it was over." Eventually, Le.P. learned of two additional incidents involving oral sex.

{¶ 19} During cross examination, Le.P. was asked whether he witnessed any behavior from L.P. from April 2015 through June 2015 that would lead him to suspect the sexual activity between L.P. and appellant. Le.P. responded, "no."

{¶ 20} M.P. was also deposed on January 14, 2020. During her deposition, M.P. indicated that L.P. had access to the internet while at home through his iPod. She testified that she randomly monitored the contents and browsing history on L.P.'s iPod. According to M.P. the iPod contained "[p]ictures of football, you know, players, like, from NFL, screen shot from games that are on your phone, you know, ah, I think that's

8.

pretty much it." Further, M.P. stated that the browser history on the iPod was "always full" and she "never saw that it was ever erased." Later in her deposition, M.P. acknowledged that she no longer knew where the iPod was located. Specifically, M.P. testified as follows:

Q. Did you take his iPod away from him as a result of these incidents?

A. We did.

Q. Okay.

A. As part of his probation, he wasn't allowed to have internet access, so we took all of his devices that had internet, yes.

Q. Were those turned over to BCI * * * or law enforcement?

A. No.

Q. Did law enforcement make any requests for them?

A. I don't know.

{¶ 21} Regarding L.P.'s involvement with appellant, M.P. corroborated Le.P.'s testimony that the two boys regularly played together inside her home. When the children were playing, M.P. was usually in the kitchen or family room on the first floor of the home. M.P. testified that the children only played in the game room on the second floor of the home. She could not recall any instances in which appellant and L.P. spent time alone in L.P.'s bedroom.

9.

{¶ 22} M.P. testified that she first learned of sexual activity between L.P. and appellant following the final incident that occurred at the end of May 2015 or beginning of June 2015. Consistent with the testimony provided by C.S., M.P. stated that she received a phone call from C.S. in the early hours of the morning following the incident. As a result, M.P. and Le.P. walked over to appellant's home. M.P. went inside the home and appellant informed her that L.P. "put his mouth on [appellant's] penis and that he got $25. His mom found the money and so he told her." During the ensuing conversation, M.P. examined appellant and asked appellant if L.P. touched his buttocks or inserted anything into his rectum. Appellant responded in the negative as to each question. However, appellant subsequently explained to M.P. that L.P. "asked him if he could put his penis in [appellant's] butt, and [appellant] said, yes, but then [appellant] said they stopped. [Appellant] said he didn't want to, [L.P.] stopped, and they went and sat on the swings."

{¶ 23} After learning of the sexual activity, M.P. returned home with Le.P. and woke L.P. up to ask him about the matter. M.P. stated that L.P. provided the same version of the event as appellant. At some point after L.P.'s admission to the foregoing sexual activity, M.P. learned of two additional incidents of sexual contact between appellant and L.P.

{¶ 24} M.P. testified that L.P. never discussed sexual ideas or urges with her prior to the aforementioned incidents. According to M.P., L.P. had not previously displayed

10.

any aggressive, physical, or sexual behavior. Further, M.P. indicated that she did not notice any changes in L.P.'s behavior or academic performance at school during the time period in which these incidents took place. In short, M.P. noticed nothing about L.P. that was out of the ordinary. However, a "couple months" before the June 2015 revelations about the sexual contact between L.P. and appellant, L.P. told M.P. that he had viewed pornography online. M.P. testified that she did not know where L.P. was located when he viewed the pornography, whether at home or at school. Further, she was unaware of any reports that L.P. forced appellant to watch pornography with him.

{¶ 25} L.P.'s second deposition was taken on October 27, 2020. During this deposition, L.P. testified that his parents periodically checked his iPod's browser history when he was not home. He did not recall ever having any discussions with his parents regarding their discovery of pornographic material on his iPod. Additionally, L.P. testified that his parents confiscated his iPod as a result of his sexual activity with appellant and the juvenile proceedings that flowed from that activity. After the iPod was taken from him, he never saw it again.

{¶ 26} Br.S. was the final witness to be deposed. During his November 18, 2020 deposition, Br.S. testified that he first learned of the sexual abuse at issue in this case when appellant disclosed it to him in June 2015, on the night of the last incident. Br.S. stated that appellant disclosed the abuse after C.S. pressed him to reveal the source of $25 in cash in his possession after returning home from L.P.'s home. Appellant informed Br.

11.

S. that the sexual abuse "entailed [L.P.] and him being naked, and in no other short terms – a blow job, and the money was for that purpose so he wouldn't tell." Appellant then told Br.S. that he was sexually abused by L.P. "four or five times" over the course of the prior two to three years. However, appellant subsequently told Br.S. that the sexual abuse occurred "hundreds of times."

{¶ 27} Based upon the evidence produced during discovery in this matter, Le.P. and M.P. filed a motion for summary judgment on February 26, 2021. In their motion, Le.P. and M.P. asserted that they were entitled to dismissal of the negligent supervision and spoliation of evidence claims brought against them.

{¶ 28} Referencing the deposition testimony summarized above, Le.P. and M.P. argued that they had no knowledge of L.P.'s propensity to engage in sexually deviant behavior with other children, and thus could not foresee such conduct with respect to appellant. As such, Le.P. and M.P. insisted that they could not be held liable for negligent supervision. Moreover, they contended that they were entitled to summary judgment on the spoliation claim because they had no knowledge of any future claims of probable litigation when they disposed of L.P.'s old iPod several years before appellant filed his complaint.

{¶ 29} On May 14, 2021, appellant filed his memorandum in opposition to appellees' motion for summary judgment. As to the claim for negligent supervision, appellant argued that Le.P. and M.P. were on notice of L.P.'s propensity to engage in

12.

inappropriate sexual conduct prior to the incidents alleged in the complaint. In support, he referenced the parties' deposition testimony and identified five reasons why Le.P. and M.P. knew or should have known about L.P.'s propensity.

{¶ 30} First, appellant asserted that C.S. notified M.P. about an incident in which L.P. forced appellant to watch pornography with him, prompting a response from M.P. that she would "take care of it." Second, appellant recalled an incident that was reported to M.P. prior to the 2015 sexual assault disclosures in which appellant allegedly grabbed appellant's sister's breasts. Third, appellant asserted that an incident predating the sexual assaults occurred in which L.P. took a photograph of his penis on a mobile phone, which was discovered by Br.S. and C.S. Fourth, appellant asserted that M.P. "corroborated that [L.P.] was viewing pornography in the months leading up to the May/June 2015 incident." Finally, appellant noted that L.P. admitted during a counseling session that M.P. "suspected something may have been going on."

{¶ 31} As to his claim for spoliation of the evidence, appellant argued that Le.P. and M.P. confiscated L.P.'s iPod as a consequence of the sexual assault incidents and have not produced the iPod despite appellant's discovery request for production of the iPod. Further, appellant contended that Le.P. and M.P. were aware of the potential for litigation when they confiscated the iPod, as evidenced by their request to Br.S. and C.S. not to report the assaults and to allow L.P. to enter into counseling. In sum, appellant insisted that the iPod "was not discarded or disposed of until *after* the incidents were

13.

brought to light and only after Defendants begged [Br.S. and C.S.] not to report the egregious conduct to law enforcement."

{¶ 32} On May 19, 2022, the trial court issued its decision on appellees' motion for summary judgment. In a two-page decision, the trial court summarily granted appellees' motion for summary judgment and dismissed all claims against Le.P. and M.P. Six days later, appellant filed a motion to reconsider in the trial court, which the trial court denied on May 31, 2022. Thereafter, appellant filed his timely notice of appeal.

{¶ 33} The matter proceeded to oral argument on February 1, 2023. At oral argument, the parties indicated that appellant's July 10, 2019 deposition transcript was contained in the record. However, upon further inquiry, appellant's counsel discovered that Br.S.'s deposition transcript was inadvertently filed twice. Consequently, on February 3, 2023, appellant filed a motion to supplement the record to include appellant's deposition transcript, which both parties reference in their briefs.

{¶ 34} Upon consideration, we find that supplementing the record with appellant's deposition transcript is warranted in light of the parties' mutual misunderstanding that the transcript was already filed in the trial court. We hereby grant appellant's motion to supplement the record with appellant's July 10, 2019 deposition transcript and we will proceed accordingly.

## B. Assignments of Error

{¶ 35} On appeal, appellant assigns the following error for our review:

The trial court erred in granting defendants [Le.P.] and [M.P.]'s motion for summary judgment dismissing all plaintiff's claims for negligent supervision and spoliation of evidence.

## II.    Analysis

{¶ 21} In his sole assignment of error, appellant argues that the trial court erred in granting summary judgment to Le.P. and M.P. on his claims for negligent supervision and spoliation of evidence.

{¶ 22} We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

{¶ 23} Here, appellant argues that the trial court erroneously dismissed his claims for negligent supervision and spoliation of evidence against Le.P. and M.P. We will examine each of these claims in turn, beginning with appellant's claim of negligent supervision.

15.

## A. Negligent Supervision

{¶ 24} "At common law, a parent is not ordinarily liable for damages caused by a child's wrongful conduct." *Huston v. Konieczny*, 52 Ohio St.3d 214, 217, 556 N.E.2d 505 (1990), citing *Elms v. Flick*, 100 Ohio St. 186, 126 N.E. 66 (1919). However, a parent may be held liable for a child's tortious conduct when "the injury committed by the child is the foreseeable consequence of a parent's negligent act." *Id.* at 217, citing *Kuhns v. Brugger*, 390 Pa. 331, 135 A.2d 395 (1957). In *Huston*, the Supreme Court of Ohio held that liability arises when parents (1) "negligently entrust their child with an instrumentality (such as a gun or car) which, because of the child's immaturity or lack of experience, may become a source of danger to others"; (2) fail "to exercise reasonable control over the child when the parent knows, or should know, that injury to another is a probable consequence"; or (3) "know of the child's wrongdoing and consent to it, direct it or sanction it." (Citations and emphasis omitted.) *Id.* at 217–218.

{¶ 25} In the present case, appellant relies exclusively on the second prong of the *Huston* test, and argues that Le.P. and M.P. "knew, or should have known, about [L.P.'s] propensity to engage in inappropriate sexual conduct." In support of his contention, appellant references the deposition testimony contained in the record and insists that such testimony reveals that L.P.'s tortious conduct was foreseeable from the perspective of Le.P. and M.P.

16.

{¶ 26} "To establish foreseeability of the act or injury [pursuant to negligent supervision], plaintiff must prove that specific instances of prior conduct were sufficient to put a reasonable person on notice that the act complained of was likely to occur." *Nearor v. Davis*, 118 Ohio App.3d 806, 813, 694 N.E.2d 120 (1997). In other words, a parent cannot be held liable for negligent supervision if the parent is unaware of the child's propensity to engage "'in the sort of conduct that caused the plaintiff's injury.'" *Hau v. Gill*, 9th Dist. Lorain No. 98CA007061, 1999 WL 492633, *2 (July 14, 1999), quoting *Doe v. Kahrs*, 75 Ohio Misc.2d 7, 10, 662 N.E.2d 101 (C.P. 1995). Thus, in order for appellant to prevail in his claim for negligent supervision in this case, he must introduce evidence to show that Le.P. and M.P. were aware of L.P.'s propensity to engage in inappropriate sexual conduct with other children.

{¶ 27} The deposition testimony introduced by the parties in this case contains no evidence that either Le.P. or M.P. had any knowledge of L.P.'s sexual activity appellant, or anyone else for that matter, prior to the final incident in June 2015. Indeed, both Le.P. and M.P. testified that they first learned of L.P.'s sexual activity *after* the final incident. Additionally, L.P. consistently testified that appellant was the only person with whom he had engaged in any sexual activity prior to June 2015, and he was insistent that he did not disclose this activity to his parents. Instead, L.P. took affirmative measures to prevent his parents from learning about his sexual activity with appellant, including convincing appellant to keep the activity a secret.

17.

{¶ 28} During his testimony, appellant acknowledged that nobody witnessed his sexual encounters with L.P. and admitted that he did not disclose the abuse to his parents while it was ongoing. Although appellant reportedly disclosed the sexual activity to I.S. "sometime before the last occurrence," there was no evidence that I.S. relayed the information to Le.P. or M.P. Br.S. and C.S. each testified that they too had no knowledge about the sexual activity between appellant and L.P., having first learned of the sexual activity on the night of the final incident.

{¶ 29} Notwithstanding these observations, appellant argues that Le.P. and M.P. should have known about L.P.'s propensity to engage in sexual acts with other children because they knew that L.P. (1) had previously grabbed appellant's sister's breasts, (2) had taken a photograph of his penis on a smartphone, (3) was viewing pornography on the internet, and (4) admitted during a counseling session that M.P. "suspected something may have been going on."

{¶ 30} We note at the outset that there is no evidence in the record to support appellant's contention that L.P. grabbed appellant's sister's breasts or took a photograph of his penis on a smartphone. The only reference to either of these acts in the record is found in M.P.'s deposition, wherein the following colloquy took place:

Q. Okay. Do you recall a phone call with [Br.S. and C.S.] that your son, [L.P.], got grabby and grabbed their daughter's breasts on numerous occasions?

18.

A. No.

Q. Okay. Do you recall a phone conversation with [Br.S. and C.S.] where your son, [L.P.], took a picture of his penis on an old cell phone at [their] house that was discovered by [Br.S. and C.S.]?

A. No.

{¶ 31} The foregoing questions from appellant's counsel were asked without any foundation or evidence to establish that L.P. did, in fact, grab appellant's sister's breasts or take a photograph of his penis. Obviously, unsupported assertions made by trial counsel in questions to a witness do not constitute evidence and thus cannot be relied upon to overcome summary judgment.

{¶ 32} Even if counsel's assertions were supported by the record, however, M.P.'s answers to the questions demonstrate that she was unaware of L.P.'s acts. Thus, those acts provide no basis for the imposition of liability for negligent supervision upon Le.P. and M.P. in this case.

{¶ 33} As to appellant's reference to online pornography, he states that C.S. notified M.P. prior to the final incident of sexual activity about an incident in which L.P. forced appellant to watch pornography with him, prompting a response from M.P. that she would "take care of it." Further, appellant notes that M.P. "corroborated that [L.P.] was viewing pornography in the months leading up to the May/June 2015 incident."

19.

{¶ 34} During his deposition, L.P. denied the accusation that he had forced appellant to watch pornography with him. Further, M.P. denied having been informed that L.P. had forced appellant to watch pornography with him. Nonetheless, there is some evidence that Le.P. and M.P. were aware of L.P.'s access to pornography on his iPod. M.P. admitted that L.P. told her that he had viewed pornography online a "couple months" before the June 2015 revelations about the sexual contact between L.P. and appellant. The record is devoid of any evidence as to the content of the pornography viewed by L.P., although L.P. insisted that he had never viewed child pornography.

{¶ 35} Le.P. and M.P. may only be held liable for negligent supervision if they were aware of L.P.'s propensity to engage in the sort of conduct that caused appellant's injury, namely sexual abuse. The evidence, when viewed in a light most favorable to appellant, supports the conclusion that Le.P. and M.P. were aware that L.P. was viewing online pornography prior to the final incident. However, there is a substantial difference between viewing online pornography in general and sexually abusing another child. Appellant's argument unreasonably conflates these two acts without explaining how one logically leads to another. Although Le.P. and M.P. were aware of L.P.'s viewing of online pornography involving adults, we do not find that this fact establishes that they were also aware of L.P.'s propensity to engage in sexual abuse of children.

{¶ 36} Finally, we turn to appellant's contention that Le.P. and M.P. were aware of the sexual activity between L.P. and appellant based upon L.P.'s written assertion,

20.

made one year after the complaint in this case was filed, that M.P. "suspected something may have been going on." Having examined that statement in its context, we do not find that it creates a genuine question of fact as to whether M.P. was aware that L.P. was engaging in sexual activity with appellant while that activity was ongoing.

{¶ 37} L.P.'s statement is part of a handwritten response to one of a series of questions listed on a "Relapse Prevention Plan" that was signed by L.P. on June 19, 2018. The plan, which was attached to appellant's memorandum in opposition to summary judgment, was part of the treatment protocol instituted by L.P.'s counselor after L.P. was adjudicated delinquent in the juvenile court as a consequence of the sexual abuse at issue in this case.

{¶ 38} Question 14 of the plan asked, "Who else knew what you were doing when this was happening?" L.P. answered, "No one." L.P. then elaborated on that answer with an additional sentence, only some of which is legible. He wrote, "My mom suspected something may have been going on not [illegible text] older [illegible text] if younger." L.P.'s response was explored during his deposition, as follows:

> Q. And some of these questions were not answered, but there's one, in particular, that I want to discuss with you. It's No. 14 here on the bottom, and you can take a look at it – who else knew what you were doing when this was happening? * * * Do you recall answering, my mom suspected something may have been going on?

21.

A. I can't really understand what's written here.

Q. Okay. Did anyone – I'll just ask the question in a different way. Did you – at the time, did you believe your mother suspected something was going on between you and [appellant]?

A. I don't know.

Q. Do you have any reason to doubt that your mother suspected something was going on at that time?

* * *

A. I do not know.

Q. Did your mother ever bring up or broach any topics with you about any sexual activity between you and [appellant] at that time?

A. I do not remember.

{¶ 39} The meaning of L.P.'s partially illegible written response to question 14 of the Relapse Prevention Plan is uncertain. Further, L.P.'s deposition testimony related to that written response yields no clarification. Rather, even L.P. was unable to ascertain what he wrote and what he meant by what he wrote. As such, we do not find L.P.'s written response was competent, credible evidence of M.P.'s awareness of the sexual activity between appellant and L.P. *See Bartlett v. Tan Pro Exp., LLC*, 6th Dist. Lucas No. L-19-1113, 2020-Ohio-2760, ¶ 10, fn 3 (declining to consider "largely illegible" incident report used to support motion for summary judgment, because "the pertinent

22.

parts of it – specifically, the sections headed "Nature of Injury," "Cause of the accident," and "How did the accident occur?" – are indecipherable"); *PHH Mortgage Corp. v. Albus*, 7th Dist. Monroe No. 09 MO 9, 2011-Ohio-3370, ¶ 12 (observing that financial documents relied upon by party moving for summary judgment were illegible and thus concluding that those documents do not qualify as competent credible evidence supporting summary judgment).

{¶ 40} Further, even the portion of L.P.'s answer that is discernible does not clearly establish that M.P. was aware of L.P.'s sexual activity with appellant. The question that prompted the response is not specific – it merely asks who else knew what L.P. was doing "when this was happening?" What "this" refers to is not stated. Moreover, L.P.'s response that M.P. suspected *something* may have been going on is unhelpful. What, in particular, did L.P. mean when he said "something?" The answer is not given, and L.P. was unable to shed any light on that question during his deposition.

{¶ 41} Whatever was meant by L.P.'s response, what is clear is that his initial answer to the question of who else knew what he was doing when "this" was happening was "no one." Since the elaboration on that answer is illegible and ambiguous, case law supports, and we therefore find, that appellant cannot use it to avoid summary judgment in this case. Accordingly, appellant's reliance upon the statement "my mom suspected something may have been going on" is unavailing.

23.

{¶ 42} In sum, the evidence in the record shows that Le.P. and M.P. did not become aware of L.P.'s inappropriate sexual activity with appellant until they were told of such activity in May or June of 2015, *after* the activity had already occurred. There is no evidence in the record that Le.P. and M.P. were aware, or should have been aware, that L.P. had a propensity to engage in inappropriate sexual conduct with other children. The record is devoid of any specific instances of prior sexual conduct involving L.P. and other children. "In the absence of any evidence indicating that parents knew or should have known that their son was sexually abusing a minor, parents cannot be held liable for negligent supervision as a result of their child's sexually abusing a minor plaintiff." *Kahrs* at 10, citing *Adolph E. v. Linda M.*, 170 A.D.2d 1011, 566 N.Y.S.2d 165 (N.Y.App. 4th Dept.1991) and *K.C. v. A.P.*, 577 So.2d 669 (Fla.App. 3 Dist.1991). Therefore, we find that the trial court did not err in granting Le.P. and M.P. summary judgment on appellant's claim for negligent supervision.

### B.      Spoliation of the Evidence

{¶ 43} Next, we turn to appellant's contention that the trial court erred in granting summary judgment on his claim for spoliation of the evidence.

{¶ 44} Under Ohio law, "[a] cause of action exists in tort for interference with or destruction of evidence." *Smith v. Howard Johnson Co.*, 67 Ohio St.3d 28, 615 N.E.2d 1037 (1993).

24.

The elements of a claim for interference with or destruction of evidence are (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts.

*Id.*

{¶ 45} In this case, appellant's spoliation claim relates to the confiscation and alleged disposal of L.P.'s new iPod. As explained in our articulation of the facts, L.P. had two different iPods during the time period at issue in this case. Prior to learning about the sexual activity involving L.P. and appellant, Le.P. and M.P. decided to use L.P.'s first iPod, the "old iPod 4," to listen to music. Consequently, they erased the hard drive on the old iPod and gave L.P. a new iPod. L.P. acknowledged that he accessed pornographic material on the first iPod, but he testified that his parents were unaware of any pornographic material on the old iPod prior to erasing the hard drive. It is clear from the record that Le.P. and M.P. had no knowledge that litigation was possible at the time they erased the hard drive on the old iPod.

{¶ 46} In his brief, appellant does not argue that the wiping of the old iPod's hard drive constituted spoliation of the evidence. Instead, he focuses his spoliation argument on Le.P.'s and M.P.'s disposal of the new iPod.

25.

{¶ 47} In her deposition, M.P. stated that she and Le.P. confiscated the new iPod but no longer knew where the iPod was located. She explained that the iPod was taken from L.P. in connection with the juvenile proceedings that were initiated after C.S. and Br.S. reported the sexual activity. The record reveals that Le.P. and M.P. asked C.S. and Br.S. not to report the sexual activity to authorities because they wanted to give L.P. an opportunity to undergo counseling. C.S. and Br.S. initially agreed, but ultimately reported the matter after it became publicly known in appellant's school. Once the proceedings were initiated, L.P. was prohibited from having access to any devices with the capability of accessing the internet, prompting the confiscation of L.P.'s iPod. According to M.P., she was unaware whether law enforcement ever requested the iPod, but confirmed that the device was never turned over to law enforcement.

{¶ 48} L.P. offered no testimony as to whether he ever viewed pornography on his new iPod. Further, there is nothing in the record to establish the existence of any evidence germane to this action on the new iPod. According to M.P. the iPod contained "[p]ictures of football, you know, players, like, from NFL, screen shot from games that are on your phone, you know, ah, I think that's pretty much it." Further, M.P. stated that the browser history on the iPod was "always full" and she "never saw that it was ever erased." L.P. testified that he could not recall ever having any discussions with his parents regarding the discovery of pornographic material on his iPod.

26.

{¶ 49} Le.P. and M.P. confiscated L.P.'s new iPod after they knew of the pending juvenile litigation involving appellant. Thus, the first two elements of appellant's spoliation claim are supported by the record evidence in this case. However, appellant can point to no evidence in the record to establish the third element, namely the willful destruction of evidence designed to disrupt appellant's case.

{¶ 50} In his brief, appellant fails to point to any evidence in the record that establishes that Le.P. or M.P. *destroyed* the iPod after confiscating it. Appellant confidently asserts that appellees' counsel "related to Plaintiff's counsel that the device in question had been discarded." However, appellant offers no evidence in support of this assertion.

{¶ 51} Further, appellant states later in his brief that Le.P. "deliberately chose to confiscate the device and then he proceeded to either discard the device or he is willfully withholding it without explanation." In order to establish the third element of his spoliation claim, appellant needs to demonstrate that Le.P. and M.P. willfully destroyed the iPod or the evidence contained therein. Showing that Le.P. and M.P. are merely withholding the evidence, whether wrongfully or otherwise, is insufficient. *See Tate v. Adena Regional Med. Ctr.*, 155 Ohio Spp3d 524, 2003-Ohio-7042, 801 N.E.2d 930, ¶ 23-28 (finding that willful destruction of evidence element in a spoliation claim requires that the evidence at issue was destroyed, and such a claim is not established by showing that a party merely concealed evidence or interfered with the discovery process).

27.

{¶ 52} Even if the iPod was destroyed in this case, appellant can point to nothing in the record to show that such destruction was designed to disrupt his case or that it did, in fact, disrupt his case. There is no evidence that the new iPod contained any material helpful to appellant's case. On the contrary, M.P. testified (and L.P. confirmed) that she regularly checked the hard drive and browser history on the iPod and never found anything elicit on the device.

{¶ 53} Appellant failed to introduce any evidence to demonstrate that L.P.'s new iPod was willfully destroyed by Le.P. and M.P. for the purpose of disrupting his case. Therefore, construing the evidence in a light most favorable to appellant, we find that the third element of appellant's spoliation claim is not established, and his claim for spoliation of the evidence must fail.

{¶ 54} Having found that appellant failed to establish that Le.P. and M.P. knew of L.P.'s propensity to commit inappropriate sexual activity with children, and in light of appellant's failure to show that Le.P. and M.P. willfully destroyed evidence, we conclude that the trial court properly granted summary judgment to Le.P. and M.P. on appellant's claims for negligent supervision and spoliation of the evidence.

{¶ 55} Accordingly, appellant's sole assignment of error is not well-taken.

28.

### III.     Conclusion

{¶ 56} For the foregoing reasons, the judgment of the Erie County Court of

Common Pleas is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant

to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                              _____
                                                                                JUDGE

Christine E. Mayle, J.

                                                                  _____
Gene A. Zmuda, J.                                                       JUDGE
CONCUR.

                                                                  _____
                                                                                JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.